[No. 64477-7-I.    Division One.    July 5, 2011.]

EMILY L. MORATTI, *Appellant*, v. FARMERS INSURANCE COMPANY
OF WASHINGTON ET AL., *Respondents*.

496

498

*Howard M. Goodfriend* and *Catherine W. Smith* (of *Smith Goodfriend PS*); and *Robert K. Dawson* and *Peter M. Brown* (of *DawsonBrown PS*), for appellant.

*Jerret E. Sale* and *Deborah L. Carstens* (of *Bullivant Houser Bailey PC*) (*Douglas G. Houser*, of counsel); and *Philip A. Talmadge* (of *Talmadge/Fitzpatrick*), for respondents.

¶1 GROSSE, J. — For purposes of the statute of limitations, a bad faith claim against an insurer accrues when the underlying judgment against the insured becomes final.

Here, the action was commenced well within the applicable statutory period, three years after entry of a judgment in the underlying tort action. We reverse the trial court's decision setting aside the jury verdict, reverse the trial court on its refusal to submit the Consumer Protection Act (CPA)[1] claim to the jury, and remand for further proceedings.

## FACTS

¶2 On May 1, 2002, then 16-month-old Emily Woodrow, now Moratti, sustained extensive burn injuries as a result of a fire at a rental house owned by William Lipscomb and insured by Farmers Insurance Company of Washington. The premises were rented to Richard Woodrow on or about October 2001. Woodrow resided there with his daughter, Emily's mother, and Emily. The fire department eventually determined that the cause of the fire was a lighted candle left unattended. There was no smoke alarm. Moratti hired an attorney, who informed Farmers of his representation and requested a copy of the rental agreement. Moratti's attorney made several demands to the insurance adjuster, and requested liability limits and copies of the rental agreement. On May 29, 2002, Farmers' adjuster, Renee Becker, informed counsel that Lipscomb was not negligent and she was closing the injury claim. On July 17, 2002, Moratti's attorney sent Becker a copy of the statute that set forth a landlord's duties regarding smoke alarms to Farmers, requesting a copy of the mandatory tenant smoke detector acknowledgement required by state law and municipal regulation. Becker did not respond. On August 6, 2002, counsel wrote Becker again requesting Lipscomb's policy limits. On August 21, 2002, counsel wrote Becker informing her that Emily's medical bills were now $793,000 and again requested the policy limits information, a copy of the lease, and the smoke detector notice, as well as documents that showed the fire department had found no

---

[1] Ch. 19.86 RCW.

negligence. These requests were also ignored. On October 10, 2002, counsel faxed a letter to Becker requesting the same information. This time Becker responded, admitting that there was no signed smoke detector notice, but again denied any negligence for the injury. Moratti's counsel called Becker to ask if he should send the settlement package in hopes that it would "change [her] mind" about liability. Becker told counsel not to bother, informing him that the decision on no liability was final. Between May 1, 2002 and July 25, 2003, Farmers did not communicate with their insured, Lipscomb, that Moratti's attorney was attempting to settle her claims against him.

¶3 Farmers hired Jack Shouman of Fire Protection Consultants to investigate the fire. Shouman completed his report on July 1, 2002. Only one nonworking smoke detector was recovered in a location far from the infant's bedroom. As a result of that report and the public agency reports, Farmers knew that no operating smoke detector was found in the house. The reserve for Moratti's claim was $5,000 even though Farmers knew that almost $800,000 of medical bills had already been incurred.

¶4 Moratti filed a lawsuit on July 25, 2003. Farmers accepted tender of that suit and provided a defense. Farmers assigned a new adjuster, Kyle Burns, who met with Lipscomb in February 2004. Lipscomb informed him that he had hired a worker to install the smoke alarms. Assessing Lipscomb as a poor witness and likely to be found liable, Burns recommended offering the policy limits. On March 15, 2004, Lipscomb was informed for the first time that he might be liable for more than his coverage. In April 2004, Farmers offered $100,000 to settle the case. The offer was rejected.

¶5 On January 27, 2007, Lipscomb entered into a settlement agreement in which he agreed to pay $600,000 of his own funds and stipulated to entry of judgment against him for $17 million in an exchange for a covenant not to execute the judgment. He assigned Moratti his bad faith and CPA claims against Farmers. Farmers intervened and attended

the reasonableness hearing where the stipulated judgment and settlement were approved. Farmers did not contest the reasonableness of the judgment, or the trial court's findings that the judgment was reasonable and not the product of fraud or collusion.

¶6 In 2008, Moratti brought this action alleging Farmers' bad faith and violation of the CPA. The case was initially assigned to the trial judge who had presided over the reasonableness hearing. That judge denied Farmers' motion to dismiss the action based on the argument that the statute of limitations had run. Because of scheduling conflicts, the matter was reassigned to another trial judge.

¶7 At the conclusion of evidence in a four-week trial, the trial court granted Farmers' CR 50 motion dismissing the CPA claim on the grounds that Lipscomb's $600,000 contribution to the settlement was not an injury to business or property. The jury considered the remaining bad faith claim and returned a verdict in Moratti's favor. Farmers moved for a judgment notwithstanding the verdict and in the alternative a new trial. The trial court set aside the jury verdict, holding that Moratti's third party bad faith claim against Farmers was barred by the statute of limitations. Alternatively, the trial court held that Farmers was entitled to a new trial because there was insufficient evidence to support a jury instruction that Farmers had a duty to act in good faith and because the trial court erred in excluding evidence in its ER 403 ruling. Moratti appeals.

## ANALYSIS

*Statute of Limitations*

¶8 Moratti first argues that the court did not have authority to modify the partial summary judgment in which it had previously ruled, as a matter of law, that the affirmative statute of limitations defense was not available to Farmers. However, absent a proper certification of finality, "an order which adjudicates fewer than all claims or the rights and liabilities of fewer than all parties is subject to

revision at any time before entry of final judgment as to all claims and the rights and liabilities of all parties."[2] Here, the claim of bad faith still needed to be adjudicated.

¶9 Nevertheless, it was error for the trial judge to dismiss the action on grounds that it was barred by the statute of limitations. There is a three-year statute of limitations for tort claims.[3] An action for bad faith in the handling of an insurance claim is a tort.[4] In *Bush v. Safeco Insurance Co. of America*,[5] this court stated that "[a] cause of action generally accrues for purposes of the commencement of the statute of limitation when a party has a right to apply to court for relief." The action "accrues for purposes of the statute of limitation when the final judgment is entered."[6]

¶10 Farmers argues that the admittedly poor handling of the claim occurred in May and October 2002, when Moratti's claim was denied without investigation and Farmers' agent told Moratti's counsel not to submit the settlement offer. Farmers' entire argument is based on the fact that when litigation commenced in 2004 it offered to settle for the full amount of its insured policy. Its argument is essentially that its insured, Lipscomb, would not have agreed to settle or would have suffered an adverse judgment in any event. We must disagree.

¶11 In *Besel v. Viking Insurance Co. of Wisconsin*,[7] the court stated:

> The principles in *Butler* do not depend on how an insurer acted in bad faith. Rather, the principles apply whenever an insurer

---

[2] *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 300, 840 P.2d 860 (1992); CR 54(b).

[3] RCW 4.16.080.

[4] *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 389, 823 P.2d 499 (1992).

[5] 23 Wn. App. 327, 329, 596 P.2d 1357 (1979).

[6] *Bush*, 23 Wn. App. at 330; *see also Castle & Cooke, Inc. v. Great Am. Ins. Co.*, 42 Wn. App. 508, 711 P.2d 1108 (1986) (the statute of limitations in a duty to defend case commences to run from the time a final judgment is rendered in the underlying lawsuit).

[7] 146 Wn.2d 730, 737, 49 P.3d 887 (2002).

acts in bad faith, whether by poorly defending a claim under a reservation of rights, *Butler*, 118 Wn.2d at 390-92; refusing to defend a claim, *Kirk v. Mt. Airy Ins*[.] *Co.*, 134 Wn.2d 558, 565, 951 P.2d 1124 (1998); or failing to properly investigate a claim. *Coventry Assoc*[s.] *v. Am*[.] *States Ins*[.] *Co.*, 136 Wn.2d 269, 961 P.2d 933 (1998).

An insurer owes its insured a duty to act in good faith, which includes an affirmative duty to undertake a good faith effort to settle when an insured's liability is likely.[8]

¶12 Farmers cannot rest on the argument that it tendered its policy limit two years later once it was faced with an "actual" suit, since its action did not necessarily correct the prior erroneous conduct:

> Whether the insurer acts in bad faith by refusing to settle in good faith or by refusing to defend, the consequences to the insured are the same. The defense may be of greater benefit to the insured than the indemnity. The defense must be prompt and timely. An insurer refusing to defend exposes its insured to business failure and bankruptcy. An insurer faced with claims exceeding its policy limits should not be permitted to do nothing in the hope that the insured will go out of business and the claims simply go away. To limit an insurer's liability to its indemnity limits would only reward the insurer for failing to act in good faith toward its insured. We therefore hold that when an insurer wrongfully refuses to defend, it has voluntarily forfeited its ability to protect itself against an unfavorable settlement, unless the settlement is the product of fraud or collusion. *See Utah Power & Light Co.*[ *v. Fed. Ins. Co.*], 711 F. Supp. [1544,] 1556[ (D. Utah 1989)]. To hold otherwise would provide an incentive to an insurer to breach its policy.[9]

Farmers complains that no actual suit was filed nor settlement offered and that therefore the adjuster's communication to the attorney that there was no liability was nothing more than a "bump" in the road, which was rectified by its

---

[8] *Smith v. Safeco Ins. Co.*, 112 Wn. App. 645, 650-51, 50 P.3d 277 (2002).

[9] *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 765-66, 58 P.3d 276 (2002) (an insurer's denial of coverage without explanation equated to a breach of its duty to defend).

offer to settle for the policy limits two years later. The circumstances surrounding the communications between the adjuster and Moratti's attorney and the content of those communications were contested at trial. Thus, this was a factual question for the jury to determine.

¶13 Farmers argues that this is a cause of action for mishandling a claim that is distinct from the duty to defend, to settle, or to indemnify and, thus, under the reasoning found in *St. Paul Fire & Marine Insurance Co. v. Onvia, Inc.*,[10] there is no presumption of harm and the insured must show actual harm. This, Farmers contends, Moratti cannot do because there was no settlement or demand offered to Farmers. But Farmers ignores the principle that the duty to settle is intricately and intimately bound up with the duty to defend and to indemnify. Those duties are continuing duties that do not stop merely because the insurer offers the policy limits two years after it left the insured with the belief that there was no liability. Moreover, whether an insurer acted in bad faith is a question of fact.[11]

¶14 A bad faith claim against an insurer is analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by the breach.[12] We can give no credence to Farmers' assertion that it did not have to respond until 2004 because no settlement offer or demand was made or suit filed until then. Farmers' argument conveniently ignores that in October 2002, when Moratti's counsel inquired as to whether Farmers would reconsider its position if he sent the demand letter, he was told that Farmers' decision was final. Relying on Farmers' stated position, Moratti's counsel did not undertake the expense of submitting a futile demand letter to Farmers. Nor was he required to do so as the law does not

---

[10] 165 Wn.2d 122, 196 P.3d 664 (2008).

[11] *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 78 P.3d 1274 (2003).

[12] *St. Paul Fire*, 165 Wn.2d at 130 (citing *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 161 Wn.2d 903, 916, 169 P.3d 1 (2007)).

require someone to do a useless act.[13] Since it was Farmers' own representation that prevented a formal demand letter, it cannot now argue that failure to make the demand bars Moratti's claim. These were factual questions for the jury.

## Alternative Ruling Granting New Trial

¶15 We do not agree with the trial court's granting of a new trial. When the trial court vacated the jury's verdict, it ruled in the alternative that Farmers was entitled to a new trial because (1) it erred in instructing the jury that the duty of good faith required an insurer to timely evaluate any settlement offer and communicate the same to its insured and, additionally, (2) it erred in excluding evidence under ER 403 that Lipscomb had unsuccessfully sued his broker and Farmers for malpractice.

### (1) Instructional Error

¶16 An appellate court reviews de novo alleged errors in a trial court's instructions to the jury. An erroneous jury instruction is not a ground for reversal unless it is prejudicial.[14] A jury instruction is prejudicial if it substantially affects the outcome of the case.[15] Instruction 11 provides:

> An insurer has a duty to act in good faith. This duty requires an insurer to deal fairly with its insured. The insurer must give equal consideration to its insured's interests and its own interests. An insurer who does not deal fairly with its insured fails to act in good faith.
>
> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters.

---

[13] *Willener v. Sweeting*, 107 Wn.2d 388, 395, 730 P.2d 45 (1986) (even where performance is a condition precedent to the right of action or performance of another, a party need not tender performance when other party will not perform that party's part of the agreement).

[14] *RWR Mgmt., Inc. v. Citizens Realty Co.*, 133 Wn. App. 265, 278, 135 P.3d 955 (2006).

[15] *RWR Mgmt.*, 133 Wn. App. at 278.

In proving that an insurer failed to act in good faith, an insured must prove that the insurer's conduct was unreasonable, frivolous or unfounded. The insured is not required to prove that the insurer acted dishonestly or that the insurer intended to act in bad faith.

The duty of good faith requires the insurer to:

(1) Perform a reasonable investigation and evaluation of a claim against its insured.

(2) If its investigation discloses a reasonable likelihood that its insured may be liable, make a good faith effort to settle the claim. This includes an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of the settlement demand;

(3) Evaluate settlement offers as though it bore the entire risk, including the risk of any judgment in excess of the policy limits;

(4) Timely communicate its investigations and evaluations, and any settlement offers to its insured; and

(5) If the settlement demand exceeds the insurer's policy limits, communicate the offer to its insured, ascertain whether the insured is willing to make the necessary contribution to the settlement amount, and exercise good faith in deciding whether to pay its own limits.

An insurer who fails to fulfill any of these duties fails to act in good faith.

During jury deliberations, the jury sent a note to the judge posing two questions with regard to instruction 11:

(1) Item #3 – What is meant by "Settlement Offer" and who is it coming from?

(2) Item #5 – What is meant by Settlement Demand, & who does this come from?

Farmers requested the judge respond, clarifying that both the "offer" and "demand" be defined "as a settlement demand or offer made by Emily Moratti, or her attorneys, to Farmers in the underlying injury case." The trial court directed the jury to re-read the instructions it had already

received. "A trial court has discretion in deciding whether to give additional [jury] instructions."[16]

¶17 After the jury issued its verdict in favor of Moratti, the trial court set aside the verdict and granted a new trial on the alternative basis that it now found insufficient evidence for a reasonable jury to find that a settlement "demand" or "offer" was made and, thus, it was error to give that instruction. We disagree; the evidence was sufficient.

¶18 Moratti's attorney, Jeffrey Herman, testified that he had prepared an asset check on Lipscomb which revealed over $500,000 of tax liens on various properties that he owned. Additionally, Herman testified to a variety of experts that he would have hired in order to go to trial on this case. At the time Emily had $800,000 worth of bills, but he had not requested costly copies because he believed Lipscomb's insurance and his ability to pay would be minimal. Herman testified that he would have been prepared to settle Emily's claim against Lipscomb for policy limits and a personal contribution of $100,000. Herman testified that he prepared a demand letter valuing Emily's damages at $15 million. Herman was told four times that he was not getting the policy limits information. Because of Farmers' recalcitrance, Moratti was forced to pursue the slow and expensive route of litigation, rather than the initially envisioned quick and inexpensive settlement.

¶19 Moreover, when Herman inquired whether Farmers would reconsider its liability position upon receipt of a demand letter, the adjuster stated, "Our liability decision is final." The adjuster testified at trial and did not dispute that conversation or that she stated the nonliability position was final. She did testify, however, that she thought she would have told the attorney to send the demand letter.

¶20 The evidence is sufficient for a jury to find that a formal demand or offer would have been futile. As noted previously, the law does not require one to perform a useless act. An insurer has a duty to make a good faith effort to

---

[16] *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 93, 896 P.2d 682 (1995).

settle a claim, including an obligation to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available.[17] Farmers cannot now argue that Lipscomb should have settled the claim when it clearly stated that its nonliability position was final.

¶21 As noted in *Mutual of Enumclaw Insurance Co. v. Don Paulson Construction, Inc.*:[18]

> The nature of the tort of insurer bad faith dictates that an " 'almost impossible burden' " of proof will fall either on the insured or the insurer. [*Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383,] 390[, 823 P.2d 499 (1992)] (quoting [ALLAN D.] WINDT, [INSURANCE CLAIMS AND DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS] § 209, at 40-41[ (2d ed. 1988)]). As the *Butler* court recognized, " '[t]he course cannot be rerun, no amount of evidence will prove what might have occurred if a different route had been taken.' " [*Butler*, 118 Wn.2d] at 391 (quoting *Transamerica Ins. Group v. Chubb & Son, Inc.*, 16 Wn. App. 247, 252, 554 P.2d 1080 (1976)). Either the insured will face the almost impossible burden of proving that " 'he or she is demonstrably worse off because of' " the insurer's bad faith or the insurer will face the almost impossible burden of proving the reverse. [*Butler*, 118 Wn.2d] at 390 (quoting WINDT, *supra*, § 2.09, at 40-41). As between the insured and the insurer, it is the insurer that controls whether it acts in good faith or bad. Therefore, it is the insurer that appropriately bears the burden of proof with respect to the consequences of that conduct.

(Sixth alteration in original.) Farmers did not timely communicate its evaluation of the case to Lipscomb in writing. Testimony is disputed as to what was conveyed orally to Lipscomb, but these are credibility issues for the jury. In a case of this magnitude, a jury should be able to conclude that more was required " 'to conduct good faith settlement

---

[17] *Truck Ins. Exch. of Farmers Ins. Grp. v. Century Indem. Co.*, 76 Wn. App. 527, 534, 887 P.2d 455 (1995).

[18] 161 Wn.2d 903, 921, 169 P.3d 1 (2007).

negotiations sufficient to ascertain the most favorable terms available.' "[19]

¶22 Instruction 11 mirrors 6A *Washington Practice: Washington Pattern Jury Instructions: Civil* 320.05, at 293 (5th ed. 2005) (WPI). The note on use to the WPI proposes that the instruction should be given when "an insured claims the insurer failed to use good faith efforts to explore settlement or settle within policy limits in a case in which the insured was exposed to an excess verdict."[20] That is precisely the case here. To be sufficient, jury instructions must accurately state the law, permit each side to argue its theory of the case and not be misleading, and, when read as a whole, properly inform the trier of fact of the applicable law.[21]

¶23 Nor is there any merit to Farmers' argument that the jurors' questions regarding instruction 11 establish that the instruction itself was unclear. Such an argument "overlooks the frequency with which juries ask for clarifying instructions, and the frequency with which trial courts tell them to rely on the instructions already given."[22] The instruction permitted Farmers to adequately argue its theory of the case, which was that Moratti never made a settlement demand and Farmers was precluded from evaluating any settlement offer since it was not made.

### (2) *ER 403 Error*

¶24 The trial court also found that it had erroneously excluded evidence of Lipscomb's suit against Farmers and its insurance broker. In 2005, Lipscomb sued Farmers and his insurance broker, Dennis Dye, claiming that both were negligent in failing to ensure that he had adequate coverage to cover Moratti's claim. His claim was dismissed on summary judgment.

---

[19] *Truck Ins. Exch.*, 76 Wn. App. at 534 (quoting *Cont'l Cas. Co. v. U.S. Fid. & Guar. Co.*, 516 F. Supp. 384, 389 (N.D. Cal. 1981)).

[20] 6A WPI 320.05, at 293.

[21] *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265 (2000).

[22] *Stark v. Celotex Corp.*, 58 Wn. App. 940, 943, 795 P.2d 1165 (1990).

¶25 ER 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The trial court granted Moratti's motion to exclude any mention of the litigation. Farmers argued that the litigation supported its theory that Lipscomb would not have settled the case because he was trying to get additional coverage from Farmers and that it was not until after he lost in that case that he settled with Moratti for personal liability. But Farmers offered its policy limits in 2004 and the Farmers/ Dye case was not brought until 2005, a year later. So the relevance of this evidence is marginal at best. This is particularly true since testimony at trial indicated that if the matter had settled expeditiously, the liability of both the insurer and the insured would have been substantially less. The exclusion of the evidence was not error.

## CPA Claim

¶26 At the conclusion of the evidence, the trial court granted Farmers' CR 50 motion to remove Moratti's CPA claim from the jury's consideration on the grounds that Lipscomb's payment of $600,000 from his own funds was not a business injury. After the jury's verdict, the trial judge changed his mind and granted Moratti's motion for a new trial on the CPA claim. He then reversed himself again and granted Farmers' motion for reconsideration of his order granting a new trial. The $600,000 is clearly a business loss. The insured was a landlord, and the liability stemmed from his rental of property in the course of his business.[23]

---

[23] *See Mason v. Mort. Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990) ("The injury element will be met if the consumer's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.").

¶27 RCW 48.01.030 provides:

The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

In *Gingrich v. Unigard Security Insurance Co.*,[24] this court held that an insurer's breach of good faith duty under RCW 48.01.030 constitutes a per se violation of the CPA. Furthermore, in addition to the $600,000 payment from his own funds, Lipscomb suffered harm when the judgment was entered against him, even though it contained a covenant not to execute.[25] Farmers' reliance on *Werlinger v. Clarendon National Insurance Co.*[26] is misplaced. There, this court held that there was no evidence that an insured had suffered harm because he was protected by a full discharge of any personal liability from a bankruptcy. There is no similar bankruptcy protection available to Lipscomb here. As noted in *Butler*:

[E]ven though the agreement insulates the insured from liability, it still

constitutes a real harm because of the potential effect on the insured's credit rating [and] damage to reputation and loss of business opportunities.[27]

armers argues that the jury was instructed to "presume" causation regarding the bad faith claim and that presumption did not transfer to the claim under the CPA. Instruction 12 provided:

If you find that Farmers failed to act in good faith then the law presumes that William E. Lipscomb was damaged, and you are bound by that presumption unless you find by the preponderance of the evidence that William E. Lipscomb was not damaged.

---

[24] 57 Wn. App. 424, 433, 788 P.2d 1096 (1990).

[25] *Besel*, 146 Wn.2d at 738 (amount of covenant judgment is the presumptive measure of an insured's harm as a result of an insurer's bad faith).

[26] 129 Wn. App. 804, 809, 120 P.3d 593 (2005).

[27] 118 Wn.2d at 399 (second and third alterations in original) (quoting *Barr v. Gen. Accident Grp. Ins. Co. of N. Am.*, 360 Pa. Super. 334, 342, 520 A.2d 485 (1987)).

But instruction 9 provided:

> Plaintiff has the burden of proving each of the following propositions:
>
> 1. That Farmers failed to act in good faith in one of the ways claimed by Plaintiff.
>
> 2. That Mr. Lipscomb was damaged; and
>
> 3. That Farmers' failure to act in good faith was a proximate cause of Mr. Lipscomb's damage.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proved, your verdict should be for Plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for Farmers.

Thus, in reaching its verdict, the jury necessarily had to find that Farmers' bad faith was the proximate cause of Lipscomb's damage. "[H]arm is an essential element of an action for bad faith handling of an insurance claim"; but once the insured meets the burden of establishing bad faith, a rebuttable presumption of harm arises.[28] That is sufficient for the CPA claim.

¶28 Accordingly, we reverse the judgment notwithstanding the verdict and reinstate the jury verdict. Further, we reverse the trial court's decision to remove the CPA claim from the jury and hold that given the jury's determination of the bad faith claim, Moratti is entitled to judgment as a matter of law for Farmers' violation of the CPA. While the amount of any civil penalty will have to abide a determination of the trial court, Moratti will be entitled to attorney fees at trial and on appeal.[29]

BECKER and SPEARMAN, JJ., concur.

Reconsideration denied October 25, 2011.

Review denied at 173 Wn.2d 1022 (2012).

---

[28] *Butler*, 118 Wn.2d at 388-89.

[29] *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 336, 858 P.2d 1054 (1993) ("Attorneys' fees on appeal are recoverable under the [CPA].").