## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| TYLER BEAN and LETICIA BEAN, | No. 60850-2-II |
| Appellants, | |
| v. | |
| MARDEZ PORTENIER, DVM, | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, J. – Tyler and Leticia Bean appeal the trial court's order granting summary judgment in favor of Dr. Mardez Portenier, DVM.

The Beans owned two Siberian husky dogs. In February 2023, the dogs escaped from their yard and went onto Portenier's property, where he keeps sheep. Portenier and his wife saw the dogs biting the sheep, and some of the sheep were dead or seriously injured. Portenier did not kill the dogs at that time, but instead he leashed and sedated the dogs using high doses of veterinary sedatives that he kept at his property. Forty-five minutes later, the dogs experienced labored breathing and other distress. Portenier then euthanized the dogs using veterinary medications. Portenier was not the dogs' veterinarian.

The Beans filed a lawsuit against Portenier for negligence, conversion, trespass to chattels, breach of gratuitous bailment, malicious injury to an animal, and veterinary negligence

related to Portenier's sedation and killing of the dogs. Portenier asserted a statutory defense of defense of livestock under RCW 16.08.020, which permits a person to kill a dog if they see the dog "chasing, biting, injuring, or killing" that person's livestock. He also asserted a common law defense of defense of property. The trial court granted Portenier's motion for summary judgment and dismissed the Beans' claims.

We hold that (1) RCW 16.08.020 does not apply because Portenier killed the dogs approximately an hour after the incident occurred, not while or shortly after Portenier observed the incident; (2) the common law defense of property defense does not apply because it was not reasonably necessary for Portenier to kill the dogs after he had sedated and confined them; (3) genuine issues of material fact exist regarding the Beans' negligence, conversion, trespass to chattels, and breach of gratuitous bailment claims; (4) the Beans' malicious injury to an animal claim fails because there is no evidence that Portenier acted with malice; and (5) genuine issues of material fact exist regarding the Beans' veterinary negligence claim.

Accordingly, we affirm the trial court's order granting summary judgment in favor of Portenier regarding the malicious injury to an animal claim, but we reverse the trial court's order granting summary judgment regarding all other claims and remand for further proceedings.

FACTS

*Background*

Portenier is a licensed veterinarian. He worked as a small animal veterinarian at an animal clinic. He also had a business license for Portenier Veterinary Services that allowed him to order veterinary medication online. Portenier kept veterinary medication at his property in case he needed it for his animals.

2

In February 2023, the Beans' huskies escaped from their yard in rural Pierce County. That afternoon, Portenier saw the dogs near his sheep. He stated that the dogs were snarling and biting the sheep, and they growled and snapped at him.

Portenier did not immediately kill the dogs. Instead, he put leashes on the dogs and then administered to them a prescription sedative that he had at his property. About 45 minutes later, Portenier observed that the dogs' vital signs were poor and they were twitching. Believing that he needed to end their suffering, Portenier then euthanized the dogs using prescription medication he had at his property.

*Procedural History*

In June 2024, the Beans filed a lawsuit against Portenier. They asserted several claims, including (1) negligence, (2) conversion, (3) trespass to chattels, (4) breach of a bailment, (5) malicious injury to an animal, and (6) professional veterinary negligence.

In his answer, Portenier denied liability for all claims and asserted affirmative defenses that he "acted within his statutory rights under RCW 16.08.020" and that his "action to euthanize the dogs was reasonably necessary given the circumstances." Clerk's Papers (CP) at 94. Portenier also asserted several counterclaims against the Beans.[1]

Portenier filed a motion for summary judgment. He argued that (1) RCW 16.08.020 and the common law defense of property established that he could lawfully kill the dogs, barring the Beans' negligence, conversion, and trespass to chattels claims; (2) the dogs walking onto his property did not create a bailment; (3) there was no evidence that he acted maliciously in euthanizing the dogs; and (4) he was not acting in his professional capacity when he euthanized

---

[1] Portenier voluntarily dismissed his counterclaims after the trial court issued its summary judgment ruling dismissing Bean's claims. Portenier's counterclaims are not at issue in this appeal.

the dogs and there was no professional veterinary patient client relationship. In support of summary judgment, Portenier submitted excerpts from his deposition, excerpts from the depositions of his wife Lareesha Carpenter, Leticia Bean, and Tyler Bean, and photographs he took of the dogs.

Portenier testified in his deposition that when he went out to check on his animals the day of the incident, the dogs were "attacking my sheep. They were snarling and biting them." CP at 54. He stated, "I was immediately afraid for my life . . . and of course for the sheep that was still alive and thrashing on the ground, moving its head from side to side, trying to avoid getting bitten by these dogs." CP at 54. Portenier described that he "saw bits of wool and meat sort of spread out everywhere, and then I saw my other sheep that was lifeless in the field." CP at 56. According to Porteiner, one of his sheep had its "arm . . . ripped off, and her stomach contents were out. . . . [S]he had bits of her anus and her intestines protruding out of her body from her rear end." CP at 59. When he approached the scene one of the dogs growled and snapped at him.

Portenier grabbed two leashes and put some xylazine in a syringe. He was able to get a leash on one of the dogs as it was growling and thrashing and then injected the dog with xylazine to sedate it. Portenier was able to confine the dog. He repeated the same process with the other dog. Portenier later realized that he had administered an excessive dose of xylazine to the dogs.

When Portenier returned to the dogs – who were confined – approximately 45 minutes later, he saw that they were not doing very well. They were lying down, their vital signs were very poor, and they were twitching. Portenier stated that he was concerned about the dogs and worried about them having seizures. He decided that the dogs needed to be put down, so he administered propofol and lidocaine to them and the dogs died.

In his summary judgment motion, Portenier also provided photographs of the dogs near the sheep. In one photo, one dog can be seen standing over a sheep that is on the ground with fur scattered. In the background of the photo, there is a sheep on the ground with visible wounds as though it skin had been torn open. Another photo shows a dead sheep with fur scattered around it and significant wounds and blood over its body. The photographs do not show any visible blood on the snouts or bodies of the dogs. In addition, the dogs appear to be calm and happy.

Carpenter testified in her deposition that when she saw the dogs, they were "biting at [the sheep's] rear area" and the dogs' "teeth were sinking in." CP at 69. Carpenter testified that she could not recall if she saw blood around the dogs at the time. She stated that she assumed the dogs were strays because they did not have collars on them.

In her deposition, Leticia Bean stated that Portenier was never the dogs' veterinarian. Tyler Bean also testified that Portenier had never treated the dogs.

In their response to Portenier's summary judgment motion, the Beans argued that questions of fact existed as to whether RCW 16.08.020 applied. They submitted an expert declaration from Mary Mattox, a dog behavioral specialist. Mattox's opinion was that the two dogs did not attack the sheep depicted in Portenier's photos. She based this opinion on the fact that the dogs do not appear aggressive in the photos, there was no blood on the dogs' muzzles or coats, and the sheep shown in the photos had been dead for several hours if not overnight. She concluded, "I do not believe these dogs attacked or killed Mardez Portenier's sheep." CP at 154.

Further, animal control officer Kerry Bayliss testified in her deposition that Portenier's photos did not indicate that the dogs attacked the sheep. In her opinion, because the sheep were "pretty much eviscerated," the animal that attacked them should have had blood on their muzzles. CP at 205.

5

In addition, the Beans argued that summary judgment should be denied regarding their conversion, trespass to chattels, gratuitous bailment, and malicious injury to animal claims.

Regarding their professional veterinary negligence claim, the Beans argued that Portenier was acting in his professional rather than his personal capacity when he used his skill and training to sedate and then euthanize the dogs. The Beans also argued that Portenier created a veterinary client patient relationship when he elected to treat the dogs with xylazine.

The Beans submitted an expert report from Heidi Shafford, DVM. Dr. Shafford stated that Portenier administered veterinary prescription-only medications that necessarily required professional veterinary judgment because a valid veterinary license is needed to order them. Dr. Shafford stated that the amount of xylazine Portenier used was a large-animal concentration of the drug, and estimated that the dogs likely received a dose that was at least five to 10 times greater than appropriate for a 100 pound dog.

Dr. Shafford's expert opinion was that although the dogs were overdosed with xylazine, "the dogs were not at risk of death from this drug based upon the estimated dose range that was administered." CP at 145. She stated that because of Portenier's inexperience with xylazine, he did not realize that the dogs would likely recover from the overdose. Dr. Shafford also stated that because he created an emergency, Portenier should have sought help from animal control services, the police, or a veterinary clinic.

Regarding euthanasia, Dr. Shafford stated that neither propofol nor lidocaine was approved for euthanasia. Moreover, these medications would not cause a quick, painless death.

Dr. Shafford stated that treatment of companion animals, including administration of prescription medications, requires a valid veterinary-client-patient-relationship (VCPR). In addition, she stated that Portenier did not have a valid VCPR when he administered medications

to the dogs, and his actions did not constitute emergency treatment that would have excused the lack of a VCPR.

Dr. Shafford concluded:

It is my professional opinion that Dr. Portenier, acting in his professional capacity as a veterinarian, intentionally and knowingly administered an overdose of sedative (xylazine) and anesthetic medications (propofol and lidocaine); he did not humanely euthanize the two Bean dogs. Dr. Portenier administered these medications without a valid [veterinary client patient relationship]. . . . In my professional opinion, the actions taken to medicate the Bean dogs constitute negligent veterinary care.

CP at 149.

The trial court granted Dr. Portenier's motion for summary judgment and dismissed the Beans' claims with prejudice. The Beans appeal the trial court's summary judgment order.

ANALYSIS

A.   STANDARD OF REVIEW

We review summary judgment orders de novo. *Mihaila v. Troth*, 21 Wn. App. 2d 227, 231, 505 P.3d 163 (2022). We view all evidence in the light most favorable to the nonmoving party, including reasonable inferences. *Id.* Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if reasonable minds can come to different conclusions on a factual issue. *Id.* "A material fact is a fact upon which the outcome of the litigation depends." *Woodall v. Freeman Sch. Dist.*, 136 Wn. App. 622, 628, 146 P.3d 1242 (2006). We consider "only evidence and issues called to the attention of the trial court" when reviewing a summary judgment motion. RAP 9.12.

B.     DEFENSE OF LIVESTOCK/PROPERTY

The Beans argue that the trial court erred in granting summary judgment in favor of

Portenier because neither RCW 16.08.020 nor the common law defense of property applies under

the facts of this case.  We agree.

1.     Legal Principles

RCW 16.08.020 states that it is lawful for a person who "shall see any dog or dogs

chasing, biting, injuring, or killing any sheep, swine, or other domestic animal . . . belonging to

such person, on any real property owned or leased by. . . such person, . . . to kill such dog or

dogs."  In *State v. Wilson*, this court stated, "In order to establish a defense under RCW

16.08.020, the facts must show that the defendant (1) saw a dog 'chasing, biting, injuring or

killing' (2) any 'domestic animal' belonging to the defendant (3) 'on any real property owned or

leased by, or under the control of,' the defendant."  10 Wn. App. 2d 719, 725-26, 450 P.3d 187

(2019) (quoting RCW 16.08.020).

Separate from RCW 16.08.020's statutory defense, a person has a common law right to

kill an animal to defend his or her property.  *Wilson*, 10 Wn. App. 2d at 724.  In *State v. Burk*, the

Supreme Court held that the defendant had a constitutional right to kill elk destroying crops on

his property as long as the killing was reasonably necessary to protect his property.  114 Wash.

370, 375-76, 195 P. 16 (1921).  This is known as the reasonable necessity rule.  *Wilson*, 10 Wn.

App. 2d at 724.  The common law right to kill an animal to defend one's property applies to the

killing of dogs that are injuring and destroying animals on one's property.  *Drolet v. Armstrong*,

141 Wash. 654, 655-56, 252 P. 96 (1927); *see also Wilson*, 10 Wn. App. 2d at 724.

A defense under RCW 16.08.020 is distinct from the common law right to kill an animal in defense of one's property. *Wilson*, 10 Wn. App. 2d at 726-28. RCW 16.08.020 does not require reasonable necessity to establish the defense. *Id.*

2. Analysis – RCW 16.08.020

Here, there is no dispute that the sheep belonged to Portenier and that the dogs were on his property. The parties dispute whether there is a genuine issue of material fact whether Portenier saw the dogs biting, injuring, or killing the sheep. But we conclude that RCW 16.08.020 does not apply because Portenier did not kill the dogs when he allegedly saw them biting the sheep, but killed them approximately an hour later.

RCW 16.08.020 states that a property owner who "shall see" a dog biting, injuring, or killing any sheep can lawfully kill that dog. This language implies a temporal component. A property owner who sees a dog attacking his sheep has the authority under RCW 16.08.020 to kill a dog *at that moment* because of the need to protect the sheep. In other words, a property owner can kill a dog that is in the act of attacking sheep or in the immediate aftermath.[2] But the language of RCW 16.08.020 does not support the proposition that the property owner can kill such a dog at some later time when it is no longer biting or injuring the sheep.

Here, Portenier could have killed the dogs immediately if he saw them biting his sheep. But he did not do that. Instead, he sedated and confined the dogs and then another 45 minutes passed. Once that occurred, Portenier's authority to kill the dogs under RCW 16.08.020 ended. At the time he killed the dogs, the dogs no longer were engaged in biting his sheep and there no longer was a need to protect the sheep.

---

[2] For example, in *Drolet*, a common law defense of property case, the court noted that the defendant "was *engaged* in killing a chicken." 141 Wash. at 655.

We conclude that RCW 16.08.020 does not apply as a matter of law under the unique facts of this case.

3.    Analysis – Defense of Property

The Beans argue that the common law defense of property also does not apply.[3] We agree.

As noted above, under the common law a person can kill an animal only if the killing was reasonably necessary to protect their property. *Wilson*, 10 Wn. App. 2d at 724. Here, it may have been reasonably necessary for Portenier to kill the dogs if they were in the act of biting his sheep. But he did not kill them then. Instead, Portenier sedated and confined the dogs. After that point, it no longer was reasonably necessary to kill the dogs.

We conclude that the common law defense of property does not apply as a matter of law under the unique facts of this case.

C.    FAULT-BASED CLAIMS

The Beans asserted several claims based on an allegation that Portenier was at fault for killing the dogs: negligence, conversion, trespass to chattels, and breach of gratuitous bailment. Because neither RCW 16.08.020 nor the common law defense of property applies, we conclude that summary judgment in favor of Portenier was not appropriate regarding these claims.

Negligence requires the breach of a duty. *Stanley v. Sierra Pac. Land & Timber*, 34 Wn. App. 2d 762, 770, 567 P.3d 1161 (2025), *review denied*, 5 Wn.3d 1030 (2026). A breach of duty occurs when a person " 'fails to exercise the care a reasonably careful person under the same or similar circumstances.' " *Id.* at 771 (quoting 6 WASHINGTON PRACTICE: WASHINGTON PATTERN

---

[3] Portenier does not address this issue.

JURY INSTRUCTIONS: CIVIL 10.02, at 128 (7th ed. 2019)). We conclude that questions of fact exist as to whether Portenier exercised ordinary care in this case.

Conversion and trespass to chattels both involve the unjustified interference with the property of another. *Repin v. State*, 198 Wn. App. 243, 270, 392 P.3d 1174 (2017) (conversion); RESTATEMENT (SECOND) OF TORTS § 217 (AM. LAW. INST. 1965) (trespass to chattels). We conclude that questions of fact exist as to whether Portenier unjustifiably interfered with the Beans' property.

A bailment occurs when property is "delivered to another for some particular purpose with an express or implied contract to redeliver when the purpose has been fulfilled." *Freeman v. Metro Transmission, Inc.*, 12 Wn. App. 930, 932, 533 P.2d 130 (1975). A gratuitous bailment arises when the bailor – the person who gives the property – receives the sole benefit or the bailment is a personal favor to the bailor. *Maitlen v. Hazen*, 9 Wn.2d 113, 123, 113 P.2d 1008 (1941); *Corwin v. Grays Harbor Washingtonian, Inc.*, 159 Wash. 92, 96, 292 P. 412 (1930). Knowledge that a person possesses another's property can be sufficient to establish a gratuitous bailment. *See Theobald v. Satterthwaite*, 30 Wn.2d 92, 94-95, 190 P.2d 714 (1948).

A gratuitous bailee can be liable for damage to property only if the damage was caused by the bailee's gross negligence. *Brewer v. Copeland*, 86 Wn.2d 58, 68, 542 P.2d 445 (1975). Gross negligence is the absence of even slight care. *Maitlen*, 9 Wn.2d at 122-23.

Here, when the dogs arrived on Portenier's property and he leashed them, he took possession of them. We conclude that questions of fact exist as to whether a gratuitous bailment was created when Portenier "possessed" the dogs for the benefit of the Beans, the dogs' owners. We also conclude that questions of fact exist as to whether Portenier was grossly negligent such that Portenier unjustifiably interfered with the Beans' property.

We hold that the trial court erred in granting summary judgment in favor of Portenier regarding the Beans' negligence, conversion, trespass to chattels, and breach of gratuitous bailment claims.

D.    MALICIOUS INJURY TO ANIMAL

The Beans asserted a claim for malicious injury to an animal. We conclude that summary judgment was appropriate for this claim.

The Beans base their malicious injury to an animal on *Womack v. Von Rardon*, where the court held that malicious injury to a pet can support a claim for emotional distress damages. 133 Wn. App. 254, 263, 135 P.3d 542 (2006). The Beans acknowledge that they have to prove that Portenier acted with malice in killing the dogs.

The Beans point to the fact that Portenier gave an overdose of xylazine and then failed to realize that the overdose would not be fatal and failed to seek help before killing the dogs. And they rely on Dr. Shafford's opinion that Portenier did not humanely euthanize the dogs. But even though Portenier's acts may have been ill-advised or improper, there is no evidence that Portenier acted with malice.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Portenier regarding the Beans' malicious injury to an animal claim.

E.    VETERINARY NEGLIGENCE

The Beans argue that questions of fact exist regarding their professional veterinary negligence claim. Portenier argues that summary judgment was appropriate because he was acting in his personal capacity rather than in his professional capacity as a veterinarian. We agree with the Beans.

1.    Legal Principles

Veterinary negligence is a form of professional negligence that is different than medical

negligence, and therefore the medical negligence statutes (chapter 7.70 RCW) do not apply.

*Sherman v. Kissinger*, 146 Wn. App. 855, 869 195 P.3d 539 (2008).  In a professional negligence

claim against a veterinarian, "the plaintiff must show the standard of care, a breach of that

standard of care, and damages that proximately resulted from that breach."  *Baechler v.*

*Beaunaux*, 167 Wn. App. 128, 135, 272 P.3d 277 (2012).

WAC 246-933-200 states, "A veterinary-client-patient relationship [VCPR] is the basis

for interaction between veterinarians and their clients and patients."  As relevant here, WAC 246-

933-200 states in part,

> (1) A [VCPR] exists when all of the following conditions have been met:
>
> (a) The veterinarian has assumed responsibility for making clinical judgments regarding the health of the animal and need for medical treatment, and the client or key party . . . has agreed to follow the instructions of the veterinarian.
>
> (b) The veterinarian has sufficient knowledge of the animal to initiate, at a minimum, a general or preliminary diagnosis of the medical conditions of the animal.  This means the veterinarian:
>    (i) Has physically examined the animal within the last year, or sooner if medically appropriate; or
>    (ii) In cases involving operations with several animals, such as encountered at farms, laboratories, or in shelters, is personally acquainted with the keeping and care of the animals by virtue of an examination of the animals or by medically appropriate and timely visits to the premises where the animals are kept.

No case discusses the rules for the existence of a VCPR with regard to a professional

negligence claim against a veterinarian.  In all the veterinary negligence cases, a VCPR was

established.  *See, e.g.*, *Repin*, 198 Wn. App. at 249 (animal treated at Washington State

University Veterinary Teaching Hospital); *Sherman*, 146 Wn. App. at 860 (animal treated at

veterinary clinic); *Baechler*, 167 Wn. App. at 130-32 (veterinarian provided euthanasia medication to animal owner at a farm).

 2. Analysis

 Both parties agree that there was no VCPR between Portenier and the dogs. But the parties have differing views regarding the effect of the absence of a VCPR.

 The Beans argue that the absence of a VCPR supports their claim for veterinary negligence. Even though there was no VCPR, Portenier assumed the responsibility of making clinical decisions about the sedation and euthanasia of the dogs. And he used his skill and training as a veterinarian to treat the dogs and used medications that were available to him only because he had a veterinary license. However, veterinarians are not supposed to treat another's pet without a VCPR.

 Portenier argues that the parties' agreement on the lack of a VCPR establishes that he was not a treating veterinarian. He asserts that there can be no professional liability without a formal VCPR relationship. Portenier states, "where no professional relationship exists, no professional duty arises." Br. of Resp't at 25. And he claims that his ability to access prescription medications did not automatically make him a treating veterinarian.

 We conclude that the absence of a VCPR is not determinative of whether the Beans have a viable veterinary negligence claim. A veterinarian treating a dog in the absence of a VCPR can itself constitute professional negligence under certain circumstances. Instead, the issue is whether Portenier was acting in his personal or professional capacity.

 There is a genuine issue of material fact regarding this issue. On one hand, Portenier was using his skill and training as a veterinarian and veterinary medications when he sedated and euthanized the dogs. On the other hand, Portenier was acting as a property and sheep owner

when he sedated the dogs to prevent them from attacking his sheep and ultimately euthanized them. And if Portenier was acting in his professional capacity, Dr. Shafford's report establishes that there is a genuine issue of material fact regarding whether he was negligent in his treatment of the dogs.

We hold that the trial court erred in granting summary judgment in favor of Portenier regarding the Beans' veterinary negligence claim.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Portenier regarding the malicious injury to an animal claim, but we reverse the trial court's grant of summary judgment regarding all other claims and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, P.J.

We concur:

_____
GLASGOW, J.

_____
CRUSER, J.